Hillsborough, }
March 1, 1938. }

LENA M. MOORE *v.* MORSE & MALLOY SHOE CO.

JOHN H. MOORE *v.* SAME.

*Paul J. Doyle* (by brief and orally), for the plaintiffs.

*Wyman, Starr, Booth, Wadleigh & Langdell (Mr. William J. Starr, Jr.,* orally), for the defendant.

PAGE, J.   The plaintiff Lena M. Moore, hereinafter called the plaintiff, was employed by the defendant as a shoe repairer on the

first floor of the defendant's factory. While sitting at her bench, performing her work, she was hit on the head by a BX electric cable falling from above.

The cable contained two wires connected with the main line on the first-floor ceiling. Until just before its fall, the cable had passed through a hole in the ceiling, and the wires had been attached to a motor-driven machine located nearly above the place where the plaintiff sat.

The defendant had ordered an employee named Lemire, who appeared to have been the defendant's sole millwright and electrician, to remove this machine, without giving him any instructions regarding the methods to be employed. There is no evidence that the defendant was chargeable with knowledge that Lemire was incompetent.

Lemire drew out the lag screws that held the machine to the floor, and then disconnected the wires from the motor. Next he taped the ends of the wires and proceeded to lower the cable through the hole in the floor until the end of the cable he was holding was within a few inches of the floor. It was his intention then to spread the two wires in opposite directions at right angles to the cable and thus suspend the cable temporarily while he went down-stairs. Arrived there, he planned to pull the cable through the hole and wind it about a pipe near the ceiling until such time as it might be needed for future use. No such use appears to have been made of the cable, but Lemire testified that his orders did not indicate what, if any, machine was to replace the one he was moving. As the record stands, it cannot be supposed that the plan he adopted was improper as far as concerned the intention to hang the cable on the pipe.

Before Lemire could spread the wires as planned, the cable slipped and fell through the hole in the floor, with the consequences already stated. If, prior to the disconnection from the machine by Lemire, the cable had fallen because of an insecure attachment, there can be no doubt that the defendant might be held liable to the plaintiff for failure to provide a reasonably safe work-place. The defendant, however, argues that under the circumstances disclosed here the cause of the falling of the cable was a mere neglect in "a detail of the service" by Lemire, a fellow-servant of the plaintiff and that Lemire's handling of the cable involved only such matters as the master might properly leave to be done by an employee otherwise competent.

The cases relied upon by the defendant to sustain this view are distinguishable upon the facts from the case before us. In *Tilley* v. *Company*, 74 N. H. 316, the plaintiff was injured by an explosion

while cleaning out a main in the defendant's gas works. The main itself was a sufficient structure, and the explosion was due to a failure to close certain valves or a failure to air the main, or both. It was held that the defendant, having provided proper appliances, was not charged with the duty of operating them. Operation could be entrusted to employees carefully selected. The problem presented was treated purely as one of operation. The characterization of the want of safety as temporary appears not to be the determining factor. The decision is understood to rest upon the fact that the process of cleaning the main was one necessary and incidental to the progress of the work for which the plant was designed. There was nothing in the process which partook of the nature of a change in the work-place, and the process was one of operation or service.

*McLaine* v. *Company*, 71 N. H. 294, presented another phase of the results of an operational or service process. The plaintiff was injured while working in a ditch by the dumping in, without warning to him, of a load of fill. The process required the dumping, but it was usual for warning to be given from the surface of the ground. The ditch, which was the work-place, was not unsafe in itself. It was rendered unsafe, from time to time, by the operational course of the work itself, which consisted in filling the ditch. The dumping was done by the fellow-servants of the plaintiff. Consequently it was said (*p.* 296): "When the danger arises not from the place itself, but from the use of it for the work, and no special skill or experience beyond that involved in doing the work is required to maintain the safety of the place, the maintenance of such safety is the duty of the servant because it is a part of the work." Moreover, the *McLaine* case presented no secret dangers unknown to the plaintiff. This case does. *Maltais* v. *Concord*, 86 N. H. 211, 215.

*Galvin* v. *Pierce*, 72 N. H. 79 involves much the same principle. The derrick used was not defective. The hoisting engineer and the foreman were competent, but the foreman gave the signal to the engineer at such time that the plaintiff, whose duty it was to adjust the chain about the stone to be lifted, suffered an injury to his hand. The opinion classified the case neatly in two sentences at *p.* 82: "The claim is as to the manner of operation by competent persons, of a suitable machine used for the purpose for which it was designed . . . . In this case the loading of the stone into the car by means of the derrick was the common employment in which the parties were engaged." The distinguishing characteristics of this and the *McLaine* case will be further considered later.

The passage quoted by the defendant from *Hill* v. *Railroad*, 72 N. H. 518, 519, does not serve its aim when read with the context, which follows: "If a rule would have protected the servant, if observed, his injury may be due either to the want of the rule,—negligence of the master,—or to its non-observance,—negligence of the plaintiff or his fellow-servants. Hence, proof of an injury preventable by a different course of conduct is not of itself evidence of the master's negligence . . . [cases cited]. There is no evidence tending to show that the defendant did not provide suitable rules; in fact, there is no reference to rules or system of business in the record." No assumption could be permitted that there was a want of suitable rules. But, as will appear, no assumption was necessary in the case at bar, since there was direct evidence of lack of any rule at all.

*Hook* v. *Company*, 82 N. H. 75 involved a failure of the master to apprehend the adoption by its servant of an improper method of service operation. Here, also, there was a failure to sustain the burden of proof that the master did not prescribe suitable rules.

In *Jutras* v. *Company*, 84 N. H. 171 the plaintiff fell upon a floor made slippery by washing. It may be admitted that the work-place was unsafe, but this resulted from no structural defect but from "an act of service, creating mere transitory perils and giving rise to no liability on the part of an employer who had furnished safe materials and made proper rules." As to the rules, this court at *p.* 172 again enforced the principle, now familiar. "So far as shown, the defendant had given the scrubber adequate instructions for the protection of his fellow-employees. The burden of proving the contrary was upon the plaintiff."

It may be remarked, in passing, that in the association of the thoughts of "act of service" and "transitory perils," the essential thought is the former. The duty of the master to provide a reasonably safe work-place is positive and continuous. *Carriere* v. *Company*, 203 Mass. 322, 325.

The first question, therefore, is whether Lemire was engaged in a mere act of service, in an operational process of such nature that he and the plaintiff are to be regarded as fellow-servants. The fact that he and the plaintiff worked under the same roof and were paid by the same master is not conclusive. While in a general and remote sense they were working to the same end, the production of shoes, the plaintiff's work was primarily in production. Lemire had nothing directly to do with production, even if we admit that the care and placing of machinery was calculated to promote the productive

process. The removal of a machine, even though possibly designed for the convenience of prosecuting manufacture, had but remote bearing upon the operational activities of the plaintiff and her fellow-servants engaged in production. But the method of the removal might, and did, have immediate effect upon the safety of the work-place. To say that Lemire was engaged in operational activity as the plaintiff's fellow-servant, rather than in the performance of an act of the master affecting the safety of the place, would be to minimize the greater and magnify the less. The case at bar presents the situation of temporary peril in the work-place caused by removal of machinery. In such a case this court has said: "The company was certainly bound to see that the methods adopted and the results arrived at were reasonably safe. It did not perform this duty, but permitted the work to be carried on by what might be found to be a dangerous method, likely to cause injury to the plaintiff in the course of his work." *Carpenter* v. *Company*, 80 N. H. 77, 79.

"It was the non-delegable duty of the defendant to safeguard the plaintiff against this danger and hence it is legally chargeable with the knowledge which its servant should have had and with the consequences of his failure to take such protective action as due care demanded under the circumstances." *Maltais* v. *Concord*, 86 N. H. 211, 216.

The evidence leaves no doubt that the master did nothing, beyond selecting Lemire as millwright and electrician, to provide a safe method in this instance. Lemire testified without contradiction that if anything of this nature was to be done, the superintendent simply told him to do it. The most that Lemire was given by way of instructions was the general order to be careful. Under these circumstances Lemire was impliedly authorized to choose his own method and execute it in his own way without any rule whatever except "to be careful." That is the practical equivalent of no rule at all. The master, having some duty to see that care is exercised by a suitable method, cannot discharge that duty by the mere injunction "to be careful," which is a mere shifting to the employee of the master's duty. By such an injunction the master can be held to do no more than to adopt, in most instances, whatever method the employee adopts, together with the consequences that may follow from the ill choice of method by the employee.

Lemire knew that the plaintiff was at work under the machine he was moving. The method actually adopted by him depended, for safety, at one point upon the suspension of the cable by the spread

wires for a sufficient time to enable him to go downstairs and draw the cable through the hole. Lemire testified flatly to the sufficiency of this method. One expert called by the plaintiff said that the wires, if spread, would have held the cable for a brief period of time. Another expert "would say they might," for the time required for going down stairs.

Assuming that the spread wires probably would have held, which is giving the defendant the benefit of all the doubt, the fact remains that the plaintiff's injuries were not caused by the failure of spread wires to hold, but by the cable slipping through the hole before the wires were spread to prevent that contingency. The plaintiff produced a witness who testified that it is customary, where the cable is not to be drawn down, to wedge the cable by sticking a screwdriver into the hole. Since we could hardly suppose that the tool would thus be put out of service permanently, the customary plugging could be found to serve only a passing purpose. Another witness said that the cable could have been wedged and its slipping through averted in this instance. What would serve one purpose would serve another of similar nature. Knowing that the cable weighed but two pounds and using common knowledge, the jury could reasonably infer that if Lemire had used this method until the wires had been spread, the cable would not have hit the plaintiff's head. In other words, the jury might have found that the defendant's failure to prescribe and use the method was causal.

We have now reached a point whence we may proceed upon even the assumption, contrary to our holding above, that Lemire was engaged in a service operation. The servant assumes only the risks ordinarily incident to the employment; he does not assume hazards unnecessarily augmented by a specific want of care of the master unless he (the servant) is charged with apprehending them. 3 Labatt, Master and Servant (2d *ed.*), *ss.* 894, 895, 1178, 1179. The master must take into account the action of familiar physical laws. *Harvey* v. *Welch*, 86 N. H. 72, 73; *Musgrave* v. *Company*, 86 N. H. 375, 377. If he should apprehend injury from a plank falling from a temporary staging, the duty may arise to notify the servant of his danger or to prevent the plank from falling. *Vaisbord* v. *Company*, 74 N. H. 470, 473. Compare *Petrus* v. *Company*, 75 N. H. 587, where the same duty of warning or avoidance was held to arise in connection with a permanent want of safety in place and instrumentality.

Even when the work of track repair, creating transitory risks in the place of work, has been held to have been no direct breach of the

duty to furnish a safe place, it has also been held that the master owed the servant the duty to anticipate the risk and to provide suitable rules and regulations for his protection. *Smith* v. *Railroad*, 73 N. H. 325. The fact appears that no method was prescribed in the case at bar. One was adopted, but it could be found unsuited to the situation which might be found to be expectable.

Distinguishing characteristics of the *McLaine* and *Galvin* cases, *supra*, were plainly noted soon after those decisions were declared. The master's duties regarding regulations fall into two categories: (1) the statement of the method by which an employer proposes to discharge his non-delegable obligation, such as that to furnish a reasonably safe place for employment; (2) the regulation of matters of detail in the work with which servants may be left to deal except where unusual complexity creates a duty to inform servants how they should act. In the second case, given a reasonable regulation, the negligence of the servant in administering the regulation may not be a breach of the master's duty. The *McLaine* and *Galvin* cases fall into the second category. The methods of work prescribed or customarily used in those cases were in themselves sufficient to discharge the master's duty. The fault lay, in each case, in the negligence of the servant engaged in the same work as the plaintiff in failing to work in accordance with the regulation. 4 Labatt, Master and Servant (2d *ed.*), s. 1531.

Where the anticipable danger is created by the usual process of the work, the master's duty is to take precautions to avoid or remove the danger, or else to warn the servant of it. *Leazotte* v. *Company*, 74 N. H. 480; *Blaisdell* v. *Company*, 75 N. H. 497, 499; *Dervin* v. *Company*, 81 N. H. 108.

In the last-named case, where the danger was created for a few moments by throwing bales of cotton down a stairway, it was said (*p.* 111): "If this were a case where the master could divest himself of responsibility by delegating the performance of the act of warning to another through the establishment of a rule or method of operation [cases cited], the defendant's motions for a nonsuit and directed verdict must nevertheless have been denied, since there is evidence upon which there might have been a difference of opinion as to whether the rule adopted provided for a reasonably safe method of operation. The test to determine this question is to be found in answer to the inquiry whether the rule, as promulgated or customarily practiced, was such a rule as the ordinarily prudent man would have adopted." Then the opinion continues with the statement that

reasonable men might have found that the exercise of ordinary care would have required either a method differing merely by the closing of a door from the one actually used, or a warning to employees. This result could be avoided neither by the fact that the method used had never before been disastrous nor the fact that the best devised means might sometimes fail to protect.

There was no evidence of warning in the case before us, and the method used by the servant to whom the defendant gave absolute freedom of choice might be found to have been insufficient. There is not the slightest evidence that the plaintiff knew of the risk or could have learned of it by the use of reasonable care. Therefore there was no assumption of the risk. *Edwards* v. *Tilton Mills*, 70 N. H. 574, 575; *Chatman* v. *Railroad*, 86 N. H. 317, 319. It follows that the defendant's motions for nonsuits were improperly granted.

Exceptions to the admission of evidence were neither briefed nor argued by either party, consequently they are treated as having been waived.

*New trial.*

All concurred.